IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF TENNESSEE
AT JACKSON


LEON LAKE,                          )
                                    )
            Plaintiff,              )
                                    )
v.                                  )        No.  1:04-cv-1251
                                    )
THE PROCTER & GAMBLE                )
MANUFACTURING COMPANY,              )
a corporation,                      )
                                    )
            Defendant.              )


**MEMORANDUM OPINION**

     This civil action is before the court on the defendant's motion for summary judgment [doc. 90].  The plaintiff has responded [doc. 97], and the matter is ripe for the court's consideration.  For the reasons discussed below, the defendant's motion will be denied.

     In his amended complaint, the plaintiff, an African American, claims that he was a victim of race discrimination in that he was denied job promotions and he was retaliated against after filing an EEOC discrimination charge.  He seeks declaratory and injunctive relief as well as damages, both compensatory

and punitive.  The only issues remaining are a failure-to-promote claim and a wrongful termination claim.[1]

## BACKGROUND

The plaintiff began working for the defendant at its Pringles plant in Jackson, Tennessee, in 1997 as a T1 technician.  He quickly earned a promotion to T2 technician.  According to the plaintiff's testimony, in 2000 he began inquiring about the process for a promotion to T3.  It appears from the record that in order to be promoted to T3 an employee must earn two "in-depth" task completions, and demonstrate competence in six areas: teamwork, decision making, problem solving and making improvements, communication and development, planning and priority setting, and leadership.  Although there is a list of "Plant Requirements Expectations" for each area, there are no specific guidelines as to what work projects would demonstrate sufficient competence in each of these areas.

The plaintiff admits that he was not ready for the promotion at that time, but he wanted to start working on it.  He approached his manager, Ms. Porter, to find out what he needed to do to get promoted.  He had already more than met the "in-depth" requirements, but he wanted some suggestions about meeting the other criteria.  She named some things she thought he needed to do.

---

[1]  The defendant suggests that there is also a wrongful transfer claim pending; however, the court's review of the Amended Complaint [doc. 48] reveals no such claim.

The plaintiff worked on the areas identified by Ms. Porter and then went to see her again with documentation to support his completion of the tasks.  She identified still more things for him to work on, at which point he asked for a Gap Analysis.  A Gap Analysis is a team meeting where the employee demonstrates how he or she has met the requirements for promotion.  If the employee is unable to demonstrate competence in a particular area, a "gap" is identified and the employee must develop an action plan to address the gap.  Once the employee believes that he or she has addressed the gap, then another Gap Analysis is convened to reconsider the promotion.  Ms. Porter told the plaintiff he was not ready for a Gap Analysis and gave him another list of things he needed to do.

The plaintiff says that he worked on the areas suggested by Ms. Porter and prepared his T3 package for Ms. Porter.  When he took it to her, she threw the package aside and refused to look at it.  She told the plaintiff that he "would be promoted when she said that [he] would be promoted."  Ms. Porter never allowed the plaintiff to schedule a Gap Analysis before she left her position. A few months later, the plaintiff again went to see Ms. Porter and she identified still more and different areas for him to work on.  In March 2001, he once again asked for a Gap Analysis, but Ms. Porter refused.  At about this time, two white employees had Gap Analysis meetings and were promoted to T3.  The plaintiff was part of the team for Skip Cook's (white male) Gap Analysis meeting, at which time he realized that he had done and documented all the same things that

earned Mr. Cook his promotion.  In fact, the plaintiff believes that his accomplishments met or exceeded those of many employees who were promoted over him.

Ms. Porter left her position, and Ms. Craig became the plaintiff's manager in July 2001.  Soon thereafter, the plaintiff went to Ms. Craig and asked for a Gap Analysis to which she assented, although with the caveat that she could not support him because she was unfamiliar with his work.  Ms. Craig reviewed the plaintiff's promotion package and thought it looked good but suggested that the plaintiff might need more examples of how he met the requirements.  The plaintiff revised his promotion package.

On September 26, 2001, the plaintiff filed his first EEOC complaint alleging race discrimination in the promotion process.  Shortly thereafter he was permitted to schedule his first Gap Analysis meeting.  The meeting, held on January 17, 2002, was cut short when Steve Helmuth, the plaintiff's department manager, left early.  Helmuth was the person who determined whether the plaintiff would be promoted.  The plaintiff says that he was finally able to reschedule the meeting in September 2002, but Helmuth again left the meeting early.  At the second meeting, the plaintiff submitted an action plan to cover the areas for which he was criticized in the earlier meeting, but Helmuth rejected the plan as not being what he wanted.  The plaintiff did not try to schedule another meeting before Helmuth left his position.

Helmuth was replaced by Ryan Swart in October 2003.  Swart told the plaintiff that he did not need another Gap Analysis meeting, but he should prepare an action plan identifying the gaps and "bullets" that had not been completed as of the second meeting.  The plaintiff once again prepared what he thought was wanted, but Swart rejected the action plan.

In December 2003, the plaintiff filed his second EEOC complaint alleging race discrimination and retaliation.  In January 2004, the plaintiff was disciplined for a mistake he claims another employee made.  The plaintiff asked for an investigation, but it was never done.  In April 2004, the plaintiff was disciplined again, this time for a "miscommunication" about taking vacation time.

In the fall of 2004, another employee (a white female) accused the defendant of improperly performing or falsifying quality tests.  Swart undertook an investigation.  Based on statements of employees who thought the plaintiff might not have done the quality tests as required and as recorded in the computer on four different occasions,[2] Swart terminated the plaintiff's employment for falsifying documents.  The plaintiff says that he performed all the tests he was supposed to and correctly recorded the information in the computer.  The plaintiff points out that, with the exception of the initial complaint, no other employee ever brought a

---

[2] Swart's notes of his interviews with the other employees are attached to his declaration. However, these notes are clearly hearsay and, with the exception of the notes related to the plaintiff's interview, the court did not consider any information in the notes.  See Fed. R. Civ. P. 56(e) (facts must be admissible as evidence to be considered).

mistake or problem to his attention at the time it occurred, nor did they report a problem with the plaintiff's work until Swart interviewed them some time later.

The plaintiff names three other African American employees whose employment was terminated after they filed EEOC complaints. The plaintiff claims that the defendant has a pattern and practice of retaliating against its employees for complaining about race discrimination.

## LEGAL DISCUSSION

Under Rule 56 of the Federal Rules of Civil Procedure, a motion for summary judgment may be granted, "if the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." The Sixth Circuit has expressly adopted a trilogy of United States Supreme Court cases which clarified the standards for summary judgment under Rule 56. *See Street v. J.C. Bradford & Co.*, 886 F.2d 1472 (6th Cir. 1989) (adopting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); and *Matsushita Elec. Indus. Co., v. Zenith Radio Corp.*, 475 U.S. 574 (1986)). In summary, these cases hold that in order for a non-moving party to defeat a motion for summary judgment, the non-moving party must come forward with persuasive evidence to support his or her claim that there is a genuine factual dispute; that is, the non-moving party must produce evidence on which the jury could reasonably find for

6

the non-moving party.  "The 'mere possibility' of a factual dispute is not enough."

*Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992) (quoting *Gregg v.*

*Allen-Bradley Co.*, 801 F.2d 859, 863 (6th Cir. 1986)).  "[T]his standard requires a

court to make a preliminary assessment of the evidence, in order to decide

whether the plaintiff's evidence concerns a material issue and is more than *de*

*minimus.*"  *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996).

A.  *Section 1981 Failure to Promote Claim*

The plaintiff alleges that the defendant discriminated against him on

the basis of race in violation of 42 U.S.C. § 1981 by denying him job promotions

which white employees with less seniority and experience were given.  Amended

Complaint at ¶ 14.   The plaintiff further alleges that  "Defendant encouraged and

maintained a promotion system that was designed to and, in fact had the effect of

preventing Plaintiff from being promoted to more lucrative or desirable jobs."  *Id.*

at ¶ 15.[3]

Section 1981 provides as follows:

---

[3] Also in the "failure to promote" section is the allegation that the defendant retaliated against the
plaintiff by "imposing disparate and unfair disciplinary actions," by following black employees "around the
workplace," and by subjecting them to "excessive supervision and monitoring."  Amended Complaint at ¶
17.  The plaintiff brings this claim under both Title VII and § 1981.  To the extent that the plaintiff is alleging
that the defendant took retaliatory actions against him, in addition to terminating him, in violation of Title
VII, he did not make this claim in his second EEOC charge and, therefore, cannot make it now.  *See*
*Farmer v. ARA Servs., Inc.*, 660 F.2d 1096, 1105 (6th Cir. 1981); *EEOC v. Bailey Co.*, 563 F.2d 439, 446
(6th Cir. 1977).  As for the plaintiff's § 1981 claim, he has pointed to no evidence in the record that he was
subjected to unfair discipline, other than his termination for alleged impermissible reasons, or excessive
supervision or monitoring which would establish a disparate treatment claim.  As discussed below, a
plaintiff may not maintain a disparate impact claim under § 1981.  Consequently, the defendant is entitled
to summary judgment on the claims contained in paragraph 17 of the complaint under both Title VII and §
1981.

(a) Statement of equal rights.   All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

(b) "Make and enforce contracts" defined.   For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

(c) Protection against impairment.  The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law.

Because the statute prohibits intentional race discrimination in the making and enforcing of contracts involving both public and private actors, *see Christian v. Wal-Mart Stores, Inc.*, 252 F.3d 862, 867-68 (6th Cir. 2001), liability is triggered only by proof of the defendant's intentional racial discrimination, not merely by proof of disparate impact.  *Gen. Bldg. Contractors Ass'n v. Pennsylvania*, 458 U.S. 375, 383-91 & n. 8 (1982).[4]   Although disparate impact may be considered

---

[4]  "Disparate impact" results from facially neutral employment practices that have a disproportionately negative effect on certain protected groups that cannot be justified by business necessity; unlike disparate treatment, disparate impact does not require a showing of discriminatory motive, since the claim is based on statistical evidence of discrimination.  *Huguley v. Gen. Motors Corp.*, 52 F.3d 1364, 1370 (6th Cir. 1995).  A disparate treatment claim alleges that the defendant intentionally based an employment decision on the race of the plaintiff.  *Id.*  It can involve an isolated incident of discrimination against an individual or allegations of a "pattern or practice" of discrimination affecting an entire class of individuals.  *Id.* To succeed on a pattern-or-practice claim, a plaintiff must prove more than isolated acts of discrimination; rather, he must establish that intentional discrimination was the defendant's

as part of a plaintiff's proof in a disparate treatment case, it is not sufficient alone to state a claim under § 1981. *Howard v. City of Southfield*, No. 95-1014, 1996 WL 518062 (6th Cir. Sept. 11, 1996).[5]

To establish a claim for racial discrimination under § 1981, a plaintiff must plead and prove that (1) he belongs to an identifiable class of persons who are subject to discrimination based on race; (2) the defendant intended to discriminate against him on the basis of race;  and (3) the defendant's discriminatory conduct abridged a right enumerated in § 1981(a). *Christian*, 252 F.3d at 871-72.  The "intent" element of the claim can be established either by direct or circumstantial evidence. *Blalock v. Metals Trades, Inc.*, 775 F.2d 703, 707 (6th  Cir. 1985).  When a plaintiff seeks to prove intentional discrimination circumstantially under  § 1981, the burden-shifting framework of *McDonnell Douglas v. Green*, 411 U.S. 792 (1973), and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981), is used.   *See Patterson v. McLean Credit Union*, 491 U.S. 164, 186 (1989), *overruled on other grounds by* Pub.L. 102-166, § 101 (noting that "this scheme of proof, structured as a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination ... should apply to claims of racial

---

"standard operating procedure." *Id.* at 336.

[5] Plaintiff has acknowledged that this is a disparate treatment case.  *See* Plaintiff's Response at p. 3 ("In disparate treatment cases in particular, such as the one before the Court....")

discrimination under § 1981") (internal quotes and citation omitted);  *Noble v. Brinker Int'l, Inc.*, 391 F.3d 715, 720 (6th  Cir. 2004) (holding that "[t]he elements of [a] prima facie case as well as the allocations of the burden of proof are the same for employment claims stemming from Title VII and § 1981") (citation omitted).

The plaintiff has not offered proof of direct discrimination;[6] therefore, the court must look to the *McDonnell Douglas* burden-shifting framework.  To establish a prima facie claim of racial discrimination based on a failure to promote, a plaintiff must demonstrate that: (1) he is a member of a protected class; (2) he applied and was qualified for a promotion; (3) he was considered for and denied the promotion; and (4) other employees with similar qualifications who were not members of the protected class received promotions. After a plaintiff creates a presumption of discrimination by establishing a prima facie case, a defendant may rebut the presumption by proffering a legitimate, nondiscriminatory reason for its decision. The plaintiff then bears the burden of showing that the defendant's proffered reason is pretextual.  A plaintiff can demonstrate pretext by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was

---

[6] "Direct evidence is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Kocak v. Cmty. Health Partners of Ohio, Inc.*, 400 F.3d 466, 470 (6th Cir.2005) (citation omitted).   It does not require the fact finder to draw any inferences to reach that conclusion.  *See Johnson v. Kroger*, 319 F.3d 858, 865 (6th Cir. 2003). Evidence of discrimination is not considered direct evidence unless a racial motivation is explicitly expressed.  *Id.*

insufficient to warrant the challenged conduct.  If a plaintiff can show that the defendant's proffered, nondiscriminatory reason is pretextual, the trier of fact may infer discrimination.  The ultimate burden of proof to show discrimination remains on the plaintiff at all times.  *See Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1020-21 (6th Cir. 2000) (citing *McDonnell Douglas*).

The defendant contends that the plaintiff cannot establish a failure-to-promote prima facie case because (1) he failed to complete the established promotion process, (2) he was not qualified for nor denied a promotion to the T3 level, and (3) he has no evidence that similarly situated, unqualified white employees were allowed to advance to the T3 level.  The plaintiff's claim is not a traditional "failure-to-promote" claim in that the plaintiff has not alleged that he applied for a specific promotion and was denied that promotion.  In fact, the defendant allowed any of its technicians to be promoted to the next level if that technician mastered all the requirements.[7]  Instead, the plaintiff contends that the defendant's system for promotion is discriminatory in nature in that white employees received promotions sooner than black employees, including himself, because they were given more encouragement and assistance.[8]   The plaintiff

---

[7] There are five levels of production technicians at the defendant's Jackson Plant, T1 through T5. The plaintiff reached the T2 level.

[8] Because the plaintiff has alleged that he was intentionally discriminated against by being denied opportunities to advance that were made available to white employees, the court need not decide whether the plaintiff has sufficiently alleged that the defendant had a pattern and practice of discriminating against its black employees.  *See EEOC v. Chicago Miniature Lamp Works*, 947 F.2d 292, 297 (7th Cir. 1991) (The line between disparate impact and disparate treatment cases may be blurred in pattern and practice cases.)

specifically contends that his efforts to meet the requirements for promotion were disregarded and minimized and he was discouraged from pursuing the promotion to T3 by his managers at the same time that white employees were being promoted based on the same type of work the plaintiff had done.

According to the defendant's human resource manager, Chiquita McBride, the process for promotion is "self-directed and must be initiated by the technician seeking the promotion." *See* Exh. 4 to doc. 90.  A technician has to have two in-depth skills in his functional area and meet all the other T3 requirements to be promoted from T2 to T3.  The defendant argues that the plaintiff cannot meet the second element required to establish a prima facie case of discrimination because the plaintiff never completed the promotion process.  Thus, he never "applied for" nor "qualified" for the promotion.  First, the defendant argues that the plaintiff never completed the Gap Analysis meeting process because there was not enough time to consider all the requirements.  As evidenced by the plaintiff's affidavit, however, the reason for the lack of time was -Helmuth's early departure from both of the meetings.  Next, the defendant argues that the plaintiff never completed the necessary Action Plan to cover the gaps identified in the meetings.  The plaintiff explains that he did complete an Action Plan, but it was deemed unacceptable and he was not given any guidance as to how to prepare a proper plan.  Last, the defendant argues that the plaintiff never received the required sign-off from Helmuth, so he could not have received

12

the promotion.  The plaintiff contends that he did everything that he knew to do to be promoted, but his managers (especially Porter and Helmuth) continually blocked his efforts.

The defendant also argues that the plaintiff was never told he would not be promoted, so all he needed to do was complete the requirements to be considered for the promotion to T3.  The court finds, however, that there is sufficient evidence in the record to raise a question of fact whether the defendant's conduct prevented the plaintiff from completing the requirements.

The defendant also argues that the plaintiff was not qualified for the promotion to T3 because he cannot demonstrate that he met every requirement. The plaintiff admits that he never closed the alleged gaps in his performance, but he submits that the requirements kept changing and that Helmuth kept leaving the Gap Analysis meetings before they were completed.  Further, the plaintiff discovered that a white employee with essentially the same work projects was promoted to T3 after one, completed Gap meeting.  It should be noted that subjective criteria used to recognize merit may provide "mechanisms for discrimination."  *See Grano v. Dep't of Dev. of Columbus*, 699 F.2d 836, 837 (6th Cir. 1983).  In this case, it appears that it is the subjective finding of the Gap team members whether the work projects of an employee meet the criteria. The court finds that the trier of fact could determine that the defendant's assertions that the

13

plaintiff failed to "close the performance gaps" was a subjective mechanism for discrimination.

Thus, the parties have presented conflicting evidence as to whether the plaintiff actually met the requirements for promotion.  The plaintiff claims that his requirements were more demanding than those of white employees who were promoted and that he was frustrated by his managers from going forward with the process.  This evidence is enough to create a dispute on this issue.

The defendant argues that white employees with "performance gaps" similar to those of the plaintiff were not promoted, so the plaintiff cannot meet the fourth element of his prima facie case.  It is undisputed that certain white employees with less seniority were promoted to T3 before the plaintiff.  While it may be true that white employees had to meet the same objective criteria to be promoted to T3 as the plaintiff, there is a genuine issue of fact as to whether the plaintiff's work product was not given the same consideration as white employees' work product or whether the plaintiff's  access to the process was hindered by his managers.

The trier of fact could find that the defendant failed to allow the plaintiff the same access to the promotion process as white employees for impermissible reasons even though the white employees with less seniority were, in fact, qualified to be promoted.  For these reasons, the court finds that the plaintiff has established a prima facie case under § 1981 on his failure to promote

14

claim. The defendant has attempted to rebut the prima case by asserting that its legitimate non-discriminatory reason for not promoting the plaintiff was his alleged failure to complete the promotion process. As discussed above, however, the plaintiff has presented evidence from which the trier of fact could find that the defendant's reason was pretextual; that is, that the plaintiff was hindered in his efforts to complete the promotion process and was, in fact, qualified for promotion to T3. Consequently, the defendant's motion for summary judgment on the plaintiff's § 1981 claim is denied.

## B. *Title VII Retaliation Claim*

The plaintiff alleges that his employment was terminated in retaliation for filing his initial EEOC charge.[9] The defendant contends that the plaintiff was terminated for falsifying documents in violation of company policy.

The framework established in *McDonnell Douglas* is applicable to claims of retaliatory discharge.[10] To establish a prima facie case of retaliation the plaintiff must show (1) that he engaged in statutorily protected activity; (2) that his employer knew that he had engaged in this protected activity; (3) that the employer took an adverse personnel action; and (4) that a causal connection existed between the protected activity and the adverse employment action. *See Abbott v. Crown Motor Co., Inc.*, 348 F.3d 537, 542 (6th Cir. 2003). "The burden

---

[9] As noted by Defendant, Plaintiff has not alleged that he was terminated on the basis of his race or in violation of § 1981.

[10] The plaintiff has not presented any direct evidence of retaliation.

of establishing a prima facie case in a retaliation action is not onerous, but one easily met." *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000).  If the plaintiff establishes a prima facie case, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions. *Abbott*, 348 F.3d at 542.  The plaintiff, who bears the burden of persuasion throughout the entire process, then must demonstrate that the proffered reason was a "mere pretext for discrimination."  *Id.*

  It is undisputed that the plaintiff engaged in a statutorily protected activity and that he suffered an adverse personnel action when he was terminated.  The defendant argues, however, that the plaintiff cannot show a causal connection between the two; that is, the plaintiff cannot show that he was terminated <u>because</u> he filed EEOC charges.

  An inference that there is a causal connection between the adverse employment action and the protected activity may be established if the plaintiff is able to produce evidence that the employer treated the plaintiff differently than other similarly situated employees or that the adverse action was taken shortly after the plaintiff engaged in the protected activity.  *Nguyen*, 229 F.3d at 563. Temporal proximity alone, however, in the absence of other evidence, is generally not sufficient to support a finding of causal connection.  *See Nguyen*, 229 F.3d at 566.  However, temporal proximity may establish a prima facie case if it is combined with other evidence that supports a finding of retaliation.  *Id.* at 566.

16

In this case, the court finds that the plaintiff has come forward with sufficient evidence to establish the necessary inference.

In this case, the relevant dates are October 5, 2001 (first EEOC complaint), December 9, 2003 (second EEOC complaint) and January 8, 2005 (date of termination).[11]  The thirteen-month period between filing his second EEOC complaint and his termination cannot, without more, create an issue of causation.  However, other instances of alleged discrimination, though insufficient to constitute adverse employment actions, can be combined with the temporal proximity to create an issue of causation.  *See  Nguyen*, 229 F.3d at 566.

In the present case, as discussed above, there is evidence from which the trier of fact could find that the plaintiff was held to a higher standard for advancement than were his white co-workers, and that his promotion process was stalled after he filed his first EEOC complaint.  In addition, the plaintiff has presented evidence that his employer began taking disciplinary actions a short time after filing his second EEOC complaint on December 9, 2003.  *See Moore v. KUKA Welding Sys. & Robot Corp.*, 171 F.3d 1073, 1080 (6th Cir. 1999) (finding that more frequent disciplinary write-ups for trivial matters and unwarranted criticism of plaintiff's work following filing of EEOC complaint could support a jury finding of retaliation).  The plaintiff was subjected to a disciplinary action on

---

[11]  The plaintiff filed a third EEOC complaint on January 19, 2005, following his termination.

January 30, 2004, for "failing to follow quality expectations."[12]  To the best of his recollection, this was the first disciplinary action ever taken against him. According to the plaintiff, the incident occurred when the wrong packing product was delivered and another worker opened it without signing off on the verification log.  The plaintiff says he was disciplined because he was assigned to the floor at the time.  He asked that the incident be investigated, but the request was denied. The plaintiff says that the white female who brought the wrong packaging material to the floor was never disciplined.

About thirty-five days later, the plaintiff was again disciplined for failing to properly notify his team leader or manager about taking some vacation time.  Then, in early November, a co-worker reported her suspicions that the plaintiff may not have completed the required quality checks and an investigation was begun.  As the investigation progressed, the plaintiff was placed on leave with pay, and then in January 2005, the plaintiff's employment was terminated.

There is also evidence that other African American employees were treated similarly after filing EEOC charges.  This evidence, along with the evidence of alleged higher standards for promotion and alleged unwarranted disciplinary actions, combined with the thirteen-month time span between the

---

[12] The defendant has a progressive "compatibility system" with disciplinary steps.  The plaintiff was placed at Step 2 after the first disciplinary action and at Step 3 after his second.

plaintiff's second EEOC charge and his termination, is sufficient to create an inference that he was terminated in retaliation for filing his charge.

Because the plaintiff has established a prima facie case, the burden shifts to the defendant to "articulate a legitimate, non-discriminatory reason for the adverse action." *Abbott*, 348 F.3d at 542. The defendant's stated reason for terminating the plaintiff is the falsification of company records, which is a legitimate, non-discriminatory reason. The defendant claims that on four different occasions in October and November 2004 the plaintiff signed a log sheet verifying that he had performed particular tests when he allegedly had not done so.

The burden, thus, shifts back to the plaintiff, requiring him to demonstrate that the proffered reason was a mere pretext for a retaliatory animus. *Id.* A plaintiff may demonstrate pretext by showing that the proffered reasons have no basis in fact; that the proffered reasons did not actually motivate his termination, or that the reasons were insufficient to motivate the termination. *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994). The Sixth Circuit explained these factors as follows:

> The first type of showing is easily recognizable and consists of evidence that the proffered bases for the plaintiff's discharge never happened, *i.e.*, that they are "factually false." The third showing is also easily recognizable and, ordinarily, consists of evidence that other employees, particularly employees not in the protected class, were not fired even though they

19

> engaged in substantially identical conduct to that which the employer contends motivated its discharge of the plaintiff. . . .  The second showing, however, is of an entirely different ilk.  There, the plaintiff admits the factual basis underlying the employer's proffered explanation and further admits that such conduct *could* motivate dismissal. . . . In such cases, the plaintiff attempts to indict the credibility of his employer's explanation by showing circumstances which tend to prove that an illegal motivation was *more* likely than that offered by the defendant.

*Id.* (emphasis in original).

The defendant relies on four separate alleged incidents of falsification of product quality test results to support the termination of the plaintiff's employment.  All of the alleged incidents were reported by white employees.  The defendant has not supplied the court with the affidavits or declarations of any of these employees, and anything they told the manager or Swart during the investigation is, at this point, hearsay.   Further, it must be noted that only one of the four incidents was contemporaneously reported to management.  It was this report that began the investigation.

A white female employee reported that the plaintiff <u>may</u> have falsified some test results the day before because she could not find all the cans in the trash that should have been tested.  Swart checked the computer records, and it appeared that the tests had been done by the plaintiff.

The other three events allegedly occurred weeks earlier and were only reported when Swart was investigating the initial report.  The plaintiff only

recalls one of the incidents when another employee reminded the plaintiff about a test that needed to be completed at midnight.  The computer shows that the results of the test were entered, but the employee never saw the plaintiff do the test.  The third alleged incident involved a report that a co-worker believed the plaintiff did the oxygen tests too quickly, but the plaintiff denied this incident.  The fourth alleged incident related to a co-worker finding some unopened cans on the work table and he became concerned that the tests had not been done.  The computer showed, however, that the required tests had been completed.  As in the first report, he could not find all the tested cans in the trash so he believed that the tests had not been done.

In his affidavit, the plaintiff denies falsifying any quality test results. He states, "the computer records indicate that the work was done, and I assert that I performed the work at issue."  The plaintiff says that "there are many times that a technician will perform his work duties without any witnesses to him having performed the work."  In the absence of any non-hearsay evidence beyond Swart's conclusions to support the defendant's position that the defendant's termination was justified, and given the plaintiff's sworn statement that he performed all the tests as they should have been done, there is an issue of fact as to whether the plaintiff actually falsified the test results.  Construing the evidence in the light most favorable to the plaintiff as the non-movant, the trier of

fact could find that the reason given for the plaintiff's termination was a pretext for retaliation based on all or some of the following:[13]

      1.  Swart accepted the word of co-workers who *surmised* that the plaintiff falsified documents over the word of the plaintiff that he did not do so.

      2.  Only one of the alleged incidents was reported contemporaneously with the event, and only one incident was brought to the plaintiff's attention at the time it occurred.

      3.  It appears that none of the co-workers who reported the alleged incidents actually saw the plaintiff do or not do the required tests, and the computer logs support the plaintiff's version of the events.

      In summary, the plaintiff has established a prima facie case of retaliation and has pointed to evidence showing that there is a disputed issue of fact as to whether the defendant's stated reason for terminating him was pretextual.  "[C]aution should be exercised in granting summary judgment once a plaintiff has established a prima facie inference of retaliation."  *Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 564 (6th  Cir. 2004).  Consequently, the defendant's motion for summary judgment on the Title VII claim is denied.

---

[13] This list is not exhaustive.

**CONCLUSION**

For the reasons discussed above, the defendant's motion for summary judgment on the remaining claims in this civil action will be denied.  An order reflecting this opinion will be entered.

ENTER:

_____*s/ Leon Jordan*_____
United States District Judge